UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LUIS MANUEL VELASQUEZ et al.,

                Plaintiffs,

- against -

THE CITY OF NEW YORK and the CITY OF
NEW YORK POLICE DEPARTMENT,

                Defendants.

08 Civ. 08478 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

      Plaintiffs Luis Manuel Velasquez, Victoria Marie Velasquez, Ana Mercedes Muniz, Elizabeth Muniz, Armando Rivera, Amanda Rivera, and Kaitlyn Ann Velasquez bring this action against defendants the City of New York (the "City") and the City of New York Police Department (the "NYPD") pursuant to 42 U.S.C. § 1983 and New York law.  Plaintiffs were residents or guests of an apartment in Manhattan when officers of the NYPD executed a search warrant there in the early morning of July 6, 2007.  Plaintiffs bring claims for civil rights violations under § 1983 and claims under state law for false arrest, malicious prosecution, negligence and negligent treatment, invasion of privacy, battery, and prima facie tort.  Defendants have moved for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, the defendants' motion is GRANTED.

## BACKGROUND

The following facts are taken from the defendants' Rule 56.1 Statement, as well as from the affidavits and documents submitted by both parties in connection with the defendants' motion. The facts are undisputed unless otherwise noted.

On June 29, 2007, Judge Ferarra of the New York Criminal Court issued a search warrant for Apartment 3D at 425 East 105th Street in Manhattan. (Def.'s Statement Pursuant to Local Rule 56.1 ("Def.'s 56.1 Statement") ¶ 2; *see* Decl. of David M. Pollack in Supp. of Def.'s Mot. for Summ. J. ("Pollack Decl.") Ex. B.) The warrant was valid for ten days and authorized the police to enter the apartment without giving notice to its occupants. (Def.'s 56.1 Statement ¶ 4.) The warrant was based on the existence of "reasonable cause" to believe that "evidence of illegal drug and firearms dealing[] may be found" at the apartment. (Pollack Decl. Ex. B.) Accordingly, the warrant authorized the NYPD to search the apartment for certain property related to those crimes. Specifically, the warrant authorized the police to search for "[c]rack/cocaine, cocaine, vials, caps, small ziplock-style bags, and other evidence of the possession and distribution of cocaine." (*Id.*) It also permitted the police to search for "documents reflecting drug or firearm transactions" and "currency and other evidence of proceeds from drug trafficking and firearms and trafficking [sic], such as financial records in any format." (*Id.*)

The warrant was supported by an affidavit signed by Detective Brian Fleming ("Fleming") of the NYPD's Narcotics Borough Manhattan North (*See* Decl. of Arlen S. Yalkut in Opp'n to Def.'s Mot. for Summ. J. ("Yalkut Decl.") Ex. A.) The affidavit was prepared by Assistant District Attorney Gabrielle Ruda based on information provided by

Fleming. (*See* Dep. Of Brian Fleming ("Fleming Dep.")[1], 17-18.) Fleming's affidavit, which has been redacted significantly, explains that the NYPD employed a confidential informant ("CI") to conduct controlled purchases of narcotics at the apartment. (*See* Yalkut Decl. Ex. A, at 2-3.) The affidavit explains that the CI was registered with the NYPD and had provided reliable information to the NYPD in the past. (*Id.* at 2, ¶ 5.b.) Detective Fleming estimated at his deposition that he had received information from this particular CI on approximately twelve to fifteen prior occasions; however, he could not recall whether on every occasion the CI's information led to the recovery of narcotics. (*See* Fleming Dep. 51-52.) Detective Fleming also testified that the CI was paid for her assistance. According to Fleming, his team commonly paid CIs forty to fifty dollars for each controlled purchase. (*Id.* at 110-12) Fleming testified that he was unaware of what other teams in the NYPD may have paid their CIs. (*Id.* at 112.)

Fleming's affidavit further describes two controlled purchases made by the CI at the apartment and confirms that the CI's description of the location of the apartment within the building is accurate. (*See* Yalkut Decl. Ex A at 3, ¶¶ 5.c.(i)-(ii), 6.) According to the affidavit, Fleming gave the CI a certain amount of cash to purchase drugs. (*Id.* ¶ 5.c.(i), (ii).) The CI then conducted the controlled purchase and returned the drugs to Fleming. (*Id.*) The affidavit indicates that the amount of narcotics purchased by the CI was consistent with the amount of money provided to the CI for the controlled purchase. (*Id.*) At his deposition, Fleming testified that he did not directly observe the CI enter the apartment or conduct the purchases and that he otherwise had no firsthand knowledge of any drug related activity in the apartment. (*See* Fleming Dep. 66, 108-110.) The

---

[1] The Fleming Deposition is attached as Exhibit H to the Declaration of Arlen S. Yalkut in Opposition to Defendant's Motion for Summary Judgment.

3

affidavit, however, does indicate that the CI described the location of Apartment 3D within the building and that Fleming "further states that the apartment is located where it is described by CI and that the door is clearly marked '3D.'" (*Id.* ¶ 6.)

The warrant was executed on the morning of July 6, 2007.  Prior to executing the warrant, Detective Fleming prepared a "Search Warrant Plan:  Pre-Execution" ("Search Warrant Execution Plan"), in which he identified the officers that were to participate in the execution, their specific assignments, and their equipment. (*See* Yalkut Decl. Ex. B; *see also* Fleming Dep. 26.)  The Search Warrant Execution Plan also contained a copy of the apartment's floor plan, which Detective Fleming obtained from the New York City Housing Authority. (Fleming Dep. 36.)  With respect to the participating officers, the Search Warrant Plan identified a total of eleven officers, including a Captain Marren, who was listed as the "overall supervisor," and a Lieutenant Mooney, who was listed as the "module leader;" Detective Fleming was listed as "bunker security." (*See* Yalkut Decl. Ex. B.)

The officers entered Apartment 3D around 6:00am.  At that time, all of the plaintiffs were inside the apartment, sleeping.  The officers, wearing helmets and bulletproof vests, broke down the door using a battering ram and announced that they were police. (*See* Fleming Dep. 40; Velasquez Dep. 32)  As a result of the noise, plaintiff Ana Mercedes Muniz awoke and left her bedroom, at which point she encountered the officers.  Plaintiff Luis Manuel Velasquez testified at his deposition that the officers threw Ana Mercedes Muniz, who was Mr. Velasquez's mother-in-law, to the floor. (Dep. of Luis Manuel Velasquez ("Velasquez Dep.") (attached as Ex. C to Pollack Decl.) 32.)  Luis Manuel Velasquez, however, also testified that Ana Mercedes Muniz did not sustain

4

any physical injuries. (*Id.* 21.) Luis Manuel Velasquez testified that the police then entered the back bedroom where he had been sleeping and threw him out of bed. As a result, Mr. Velasquez's arm hit a door frame and he suffered a bruise. (*Id.* 26; *see* Def.'s 56.1 Statement ¶ 13.) The officers then brought all the occupants into the hallway and placed handcuffs on plaintiffs Luis Manuel Velasquez, Ana Mercedes Muniz, Elizabeth Muniz, and Armando Rivera, all of whom were adults at the time. (Def.'s 56.1 Statement ¶ 6.) Plaintiffs Amanda Rivera, Victoria Marie Velasquez, and Kaitlyn Ann Velasquez were children at the time and were not handcuffed. (*Id.* ¶ 7.) Luis Manuel Velasquez testified that the officers then asked him if there were any drugs or weapons in the apartment. (Velasquez Dep. 45.) Mr. Velasquez told the officers that there were no drugs, but that there were two rifles in his bedroom closet. (*Id.*) The officers then took Mr. Velasquez to the bedroom and located the rifles. (*Id.*) The officers also located ammunition underneath Velasquez's bed and a switchblade in a desk drawer in Velasquez's bedroom. (*See id.* at 45-47.) The officers also recovered five imitation pistols in the bedroom closet of Mr. Velasquez's son, plaintiff Armando Rivera. (*See id.* at 38, 49.) The rifles were not registered to Mr. Velasquez. (Def.'s 56.1 Statement ¶ 10.) Mr. Velasquez testified that the rifles were registered to his brother-in-law, Frankie Muniz, and that Mr. Muniz kept the rifles at the apartment because he used to live there. (*See* Velasquez Dep. 37, 51-52.)

According to Mr. Velasquez, the search of the apartment lasted about one hour. (*Id.* at 40.) After completing the search, the officers removed the handcuffs from all of the plaintiffs except for Mr. Velasquez. (Def.'s 56.1 Statement ¶ 12.) Mr. Velasquez was taken into custody and placed in a police van outside of the apartment building. (*Id.* ¶ 17.)

None of the other plaintiffs were taken into police custody. (*Id.* ¶ 16.)  Nonetheless, the record indicates that an "Omniform System-Arrests" form was created for each plaintiff. Each arrest form contains substantially identical language stating that each plaintiff "was observed in possession of a firearm." (Yalkut Decl. Ex. D.)  With the exception of the form created for Mr. Velasquez, however, the "processing type" on each arrest form is listed as "voided arrest," and each form states that "after further investigation no crime was committed." (*Id.*)

Mr. Velasquez remained in the police van for forty-five minutes before arriving at the precinct. (Def.'s 56.1 Statement ¶ 18.)  Mr. Velasquez testified that during this time he began to cough and that his blood pressure began to rise. (Velasquez Dep. 42.)  At the time, Mr. Velasquez was suffering from a number of pre-existing health conditions, including an enlarged heart, high blood pressure, and high cholesterol. (Def.'s 56.1 Statement ¶ 26.)  After about twenty minutes inside the police van, Mr. Velasquez informed the officers that he needed to use the restroom, but the officers told him he would have to wait until they arrived at the precinct. (*Id.* ¶¶ 19-20.)  Upon arriving at the precinct, Mr. Velasquez was able to use the bathroom in his cell. (*Id.* ¶ 21.)

Inside his cell, Mr. Velasquez continued to cough.  He felt sick enough that he laid down on a bench inside the cell. (Velasquez Dep. 55.)  At that point, an officer came up to Mr. Velasquez's cell and asked him if he was "okay." (*Id.*)  Mr. Velasquez said, "No, I need to see a doctor." (*Id.*)  The officer told Mr. Velasquez, "Let me take you to Central Booking, you should be out in a few hours," to which Mr. Velasquez replied, "No, I have to see a doctor." (*Id.*)  The officer then told Mr. Velasquez, "I will be back." (*Id.*)  When a different officer approached, Mr. Velasquez repeated that he needed to see

6

a doctor, but the officer responded, "Me don't speak English." (*Id.*) A third officer then approached the cell and told Velasquez that he needed to be fingerprinted. (*Id.*) This officer took Mr. Velasquez from his cell, gathered his pedigree information, and brought him to get fingerprinted. (*Id.* at 55-56.) At this point, the first officer returned and informed Mr. Velasquez that his wife had brought him his medication. (*Id.* at 56.) Mr. Velasquez, however, did not take the medication because "it was too late already." (*Id.*) The first officer then informed Mr. Velasquez that the officers would bring him to the hospital. (*Id.*) Mr. Velasquez requested that he be taken to Mt. Sinai Hospital because Mt. Sinai Hospital had all of his records. (*Id.*) The officers, however, informed Mr. Velasquez that he would be taken to Bellevue Hospital. (*Id.*)

Mr. Velasquez was admitted to Bellevue at 3:05 p.m. on July 7, 2007, where he was treated for hypertension. (Def.'s 56.1 Statement, ¶ 25.)

With respect to the events at the apartment, Mr. Velasquez was charged with two counts of Criminal Possession of a Weapon in the Fourth Degree. (Def.'s 56.1 Statement, ¶ 15.) The charges were dismissed on May 8, 2008. (*See* Yalkut Decl. Ex. E.)

On October 3, 2007, the plaintiffs filed a Notice of Claim with the City of New York. (*See* Pollack Decl. Ex. G.) On October 3, 2008, the plaintiffs brought this action. On March 15, 2011, the defendants filed their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party must demonstrate that no genuine issue exists as to any material fact. *Celotex*, 477 U.S. at 323–25. As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the non-moving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23. In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

**DISCUSSION**

I. **Claims Against the NYPD**

As the plaintiffs concede, the NYPD is not itself a suable entity. *Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). Accordingly, plaintiffs' claims may proceed only against the City of New York.

II. **Claims against the City of New York**

All plaintiffs have brought claims against the City under § 1983 for "civil rights violations"[2] and claims under New York law for false imprisonment, negligent treatment, invasion of privacy, negligence, and prima facie tort. In addition, plaintiffs Luis Manuel Velasquez and Ana Mercedes Munoz have brought claims under New York law for battery. Luis Manuel Velasquez also has brought claims under New York law for malicious prosecution and false arrest.

A. **Federal Claims: Municipal Liability Under § 1983**

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat

---

[2] While the complaint contains a cause of action for each plaintiff that cites 42 U.S.C. § 1983 and is entitled "civil rights violation," those causes of action do not indicate which constitutional rights the defendants are alleged to have violated. The defendants appear to have interpreted the complaint to allege under § 1983 violations of the Fourth and Fourteenth Amendments through claims of unlawful entry on behalf of all plaintiffs, false arrest on behalf of all plaintiffs, malicious prosecution on behalf of Luis Manuel Velasquez, excessive force on behalf of Luis Manuel Velasquez and Ana Mercedes Muniz, and deliberate indifference to medical needs on behalf of Luis Manuel Velasquez. The "civil rights" causes of action also cite 42 U.S.C. § 1981 (relating to equal protection) and 42 U.S.C. § 1985 (relating to conspiracies to violate civil rights). (*See, e.g.*, Pollack Decl. Ex. A, ¶¶ 43, 80, 112.) The plaintiffs, however, plainly have offered no evidence in support of violations of these provisions, and neither party has addressed the issues in their briefs. Accordingly, the Court will do so neither.

superior theory." *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 691 (1978) (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Shomo v. City of N.Y.*, 579 F.3d 176, 184 (2d Cir. 2009) ("To ultimately prevail on his municipal liability claim against the City, [a plaintiff] must establish that violations of his constitutional rights were precipitated by a municipal policy or custom."). Thus, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007).

A plaintiff sufficiently pleads and proves a policy or custom by showing any of the following:

> (1) the existence of a formal policy which is officially endorsed by the City; (2) actions taken or decisions made by City officials with final decision making authority which caused the alleged violations of [] civil rights; (3) a City practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of policymaking officials; or (4) a failure by City policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Allen v. Mattingly*, No. 10 CV 667, 2011 WL 1261103, at *14 n.15 (E.D.N.Y. Mar. 29, 2011) (citing *Sulehria v. City of N.Y.*, 670 F. Supp. 2d 288, 320 (S.D.N.Y. 2009)).

At the same time, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Hayes v.*

*Perotta*, 751 F. Supp. 2d 597, 601 (S.D.N.Y. 2010); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . ."). Likewise, two incidents together are insufficient to establish a custom or practice. *See Giaccio v. City of N.Y.*, 502 F. Supp. 2d 380, 389 (S.D.N.Y. 2007) (evidence that New York City Department of Transportation leaked medical records of two employees insufficient to support § 1983 claim against City because "the combined evidence of only two incidents would still be insufficient to show a 'custom or usage' under the *Monell* standard"); *Bowles v. City of N.Y.*, Nos. 00 Civ. 4213, 03 Civ. 3073, 2006 WL 1418602, at *16 & n.31 (S.D.N.Y. May 23, 2006) (two denied requests for Sundays off work); *see also Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002) ("[T]*wo incidents* of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a *widespread* or *well-settled* custom." (emphasis in original)).

The plaintiffs' complaint is devoid of any mention of an official policy or custom that caused their constitutional rights to be violated. In their brief in opposition to this motion, however, the plaintiffs allege that the narcotics division of the NYPD had a "policy of employing confidential informants without without [sic] verifying the information." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 11.) The plaintiffs argue that this policy resulted in a violation of their Fourth Amendment rights because it allowed the police to obtain a warrant, whose scope the police later exceeded by seizing items not described in the warrant. (*See id.*) The plaintiffs' argument, however, is without merit.

The plaintiffs, to be sure, have produced evidence from which a reasonable factfinder could conclude that the NYPD had an official policy or custom of employing confidential informants to gather information relevant to ongoing criminal investigations. For example, Detective Fleming's affidavit in support of the search warrant indicates that the confidential informant who conducted the controlled purchase at Apartment 3D was "registered with the New York City Police Department under CI #07-000586." (Yalkut Decl. Ex. A, ¶ 5.)  In addition, Detective Fleming, in his deposition testimony, made reference to the general procedure of paying a confidential informant to conduct a controlled purchase and to the general procedure of searching a confidential informant both before and after the controlled purchase takes place. (*See* Fleming Dep. 103, 110-12.)  These facts are sufficient to permit a reasonable factfinder to conclude that the NYPD had an official policy or custom of employing confidential informants.

The plaintiffs, however, have not made a sufficient showing that the NYPD's policy included a custom of failing to verify the accuracy of confidential informants' information.  In that regard, plaintiffs have shown little more than that during this particular investigation, Detective Fleming did not directly observe the confidential informant enter Apartment 3D, and that he otherwise did not gain independent knowledge of any drug related activities at that address.  Fleming's deposition testimony offers nothing to shed light on either the investigative tactics he employed in prior experiences with confidential informants or on the practices of other police officers with respect to their confidential informants.  Thus, plaintiffs hardly have made a showing that Fleming's conduct here was "part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have

been aware." *Castilla v. City of N.Y.*, No. 09 Civ. 5446, 2011 WL 4345934, at *3 (S.D.N.Y. Aug. 22, 2011).

In addition, neither Detective Fleming nor ADA Ruda, who prepared the affidavit in support of the warrant, qualifies in this instance as a "City official[] with final decision making authority," *Allen*, 2011 WL 1261103, at *14 n.15, whose conduct alone could subject the City to liability. The issue whether a municipal employee has "final policymaking authority is a question of state law and is an issue to be decided by the court." *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "The case law in this Circuit has often determined that ADAs are not policymakers for purposes of municipal liability." *Conte v. County of Nassau*, No. 06 Civ. 4746, 2010 WL 3924677, at *29 (E.D.N.Y. Sept. 30, 2010) (collecting cases)). This especially is true where the ADA undertakes "[a]ctivities such as negotiating plea agreements, scheduling hearings, and filing affirmations in support of writs[, which] are typically actions of assistant district attorneys undertaken in the prosecution of a criminal case. Such actions cannot be said to represent the actions of a policymaker responsible for a delineated policy that caused a constitutional deprivation." *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 169-70 (S.D.N.Y. 2007). The decision here of a Detective and an ADA to apply for a search warrant falls into this category. *See id.* at 161, 168-70 (holding that ADA was not "an official with final policymaking authority" where his actions included "moving the New York Supreme Court to issue a bench warrant" for an arrest).

Plaintiffs argue that the Search Warrant Execution Plan supports the existence of the alleged policy because, in the plaintiffs' view, the Plan lists "an entire chain of

command . . . including senior personnel with policy making authority." (Pl.'s Mem. 11.) The Search Warrant Execution Plan lists, among others, a Captain Marren, a Lieutenant Mooney, and a Sergeant Berkel, and Detective Fleming testified that the individuals listed in the Plan were present at a pre-execution meeting. (*See* Yalkut Decl. Ex. B; Fleming Dep. 25-29.) Plaintiffs suggest that the presence of a police Captain, Lieutenant, and Sergeant at a warrant-execution-plan meeting is evidence of a policy or custom of NYPD officers relying on confidential informants to obtain warrants without verifying their information.

Setting aside that plaintiffs have offered no evidence of the policy-making authority of these individuals, plaintiffs' argument is flawed. The policy which plaintiffs seek to prove is one that relates to the use of confidential informants in *obtaining* search warrants. The plaintiffs' evidence of that policy, however, consists of the involvement of various individuals *after* a warrant was issued. This evidence by itself justifies only the weakest of inferences about the role of these supervising officers in the warrant application process. Absent any evidence that the supervising officers were aware of the circumstances under which the warrant was obtained, evidence that the supervising officers participated in the planning of the warrant's execution does little to suggest either that conduct like Fleming's was so widespread as to amount to an official custom, or that the supervising officers' involvement itself amounts to a "decision[] made by City officials with final decision making authority" to obtain a warrant based on the un-verified information of a confidential informant. *Allen*, 2011 WL 1261103, at *14 n.15.[3] Under these circumstances, the City has met its burden of showing that there is no

---

[3] Plaintiffs do not argue that the supervising officers' involvement amounts to "a failure by City policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees." *Allen*, WL 1261103, at *14 n.15.

14

genuine issue of material fact with respect to the existence of an NYPD policy or custom of employing confidential informants without verifying their information.

Even if the plaintiffs had shown that Fleming's decision to apply for the warrant amounted to "conduct properly attributable to the municipality," *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 405 (1997), the plaintiffs nonetheless have failed to show that his decision was the cause of their alleged injuries. The plaintiffs do not contest the validity of the warrant. To the contrary, they concede that it was validly obtained. (*See* Pl.'s Mem. 8-9.) Instead, they appear to argue that by obtaining a search warrant based on information provided by a confidential informant, Detective Fleming "launch[ed] a series of events that ultimately cause[d] a violation of federal rights." *Brown*, 520 U.S. at 405. Indeed, the constitutional violations of which the plaintiffs complain—seizure of property outside the scope of the warrant, false arrest, malicious prosecution, excessive force, and deliberate indifference to medical needs—relate exclusively to the conduct of the officers during and after the execution of the search warrant. The plaintiffs make no claims questioning the validity of the warrant itself.[4] Thus, the plaintiffs' alleged injuries were not the direct result of the "municipal policy" of employing confidential informants to obtain warrants. Rather, the alleged

---

[4] Nor does it appear that such a challenge would have been successful. "In determining what constitutes probable cause to support a search warrant when the warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of the circumstances' bearing upon its reliability." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). Where a confidential informant previously has provided reliable information and where the confidential informant has conducted controlled purchases of narcotics, courts have found probable cause to support a search warrant. *See, e.g.*, *id.* at 1012-15; *Rodriguez v. City of N.Y.*, No. 02 Civ. 8203, 2004 WL 444089, at *3-4 (Mar. 10, 2004) (finding that probable cause existed where confidential informant conducted two controlled purchases of narcotics at target location). The situation here is similar. Fleming's affidavit indicated that the confidential informant previously provided reliable information, that the confidential informant conducted at least two controlled purchases under his supervision, and that Fleming verified that the target apartment was located where the informant said it was located. Thus, the plaintiffs could not have challenged successfully the validity of the warrant based on a lack of probable cause.

municipal action, even under the plaintiffs' own version of the events, was a "facially lawful municipal action [that] has led an employee to violate a plaintiff's rights." *Id.* at 407. Under these circumstances, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405 (citing *Canton v. Harris*, 489 U.S. 378, 391-32 (1989)). To that end, the Supreme Court has held that such a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* (quoting *Canton*, 489 U.S. at 388). The plaintiffs neither have argued nor offered any evidence to that effect. Indeed, they have offered nothing to suggest that Fleming's lawful decision to apply for a warrant was made with "deliberate indifference" to the plaintiffs' rights, nor have they shown that the "known or obvious consequences" of Fleming's lawful decision would include constitutional violations of the sort the plaintiffs allege. *Id.* at 405, 411 (requiring a plaintiff to show that the municipal actor "consciously disregarded an obvious risk that the officer would subsequently inflict a particular constitutional injury"). As a result, the plaintiffs cannot show that the alleged policy or custom caused their constitutional injuries. Accordingly, the City is entitled to summary judgment and cannot be liable under § 1983 on any of the plaintiffs' claims. The plaintiffs' federal claims therefore are dismissed.

### B. State Law Claims

The plaintiffs' remaining claims are claims under New York common law for various torts. Jurisdiction over these claims is based on the Court's supplemental

16

jurisdiction under 28 U.S.C. § 1367.  Because the Court has dismissed all of the plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over the plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Warheit v. City of N.Y.*, No. 02 Civ. 7345, 2006 WL 2381871, at *13 (S.D.N.Y. Aug. 15, 2006) (declining to exercise supplemental jurisdiction over state law claims where plaintiff's § 1983 claims were dismissed on summary judgment); *Rodriguez v. City of N.Y.*, No. 02 Civ. 8203, 2004 WL 444089, at *4-5 (Mar. 10, 2004) (same where plaintiffs' § 1983 *Monell* claim was dismissed on summary judgment).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED. Plaintiffs' federal claims are dismissed with prejudice, and plaintiffs' state law claims are dismissed without prejudice to renewal in the proper state court. The Clerk of the Court is directed to close this motion and close this case.

SO ORDERED.

Dated: New York, New York
       January 25, 2012

_____
Richard J. Holwell
United States District Judge